**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO. 6:15-27** |
| | § | |
| **SOCORRO PENA-GARZA &** | § | |
| **EMMA MORALES-HINOJOSA** | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION & ORDER**

## I. Background

On May 21, 2015, Emma Morales-Hinojosa ("Morales") and her husband, Socorro Pena-Garza ("Pena"), were indicted for conspiracy to transport undocumented aliens between December 2011 and September 2014, in violation of 8 U.S.C. § 1324. Morales was not arrested until April 28, 2017, more than 23 months after she was indicted. Pena was not arrested until July 13, 2017, almost 26 months after he was indicted.

Now pending before the Court is Morales' Motion to Dismiss Indictment for Violation of Defendant's Constitutional Right to a Speedy Trial (D.E. 35), to which the Government has responded (D.E. 42). Also pending is Pena's almost identical motion to dismiss the indictment on speedy trial grounds (D.E. 43). A hearing on both motions was held on September 25, 2017, (9/25/2017 Hrg. Tr., D.E. 58) and continued on October 10, 2017 (10/10/2017 Hrg. Tr., D.E. 60). Pena thereafter filed a memorandum in support of his motion to dismiss (D.E. 55), which Morales moved to adopt as her own (D.E. 56).[1]

---

1. Morales' Motion to Adopt Memorandum Filed by Co-Defendant (D.E. 56) is **GRANTED**.

## II. Legal Standard

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."[2] Courts consider four factors in determining whether a defendant's Sixth Amendment right to a speedy trial has been violated: "(1) Length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). "The first prong of *Barker*, the length of delay, is merely a threshold 'triggering mechanism.' The Court need not inquire into the other factors unless there has been a delay of such length as to be 'presumptively prejudicial.'" *United States v. Edwards*, 577 F.2d 883, 888 (5th Cir. 1978) (quoting *Barker*, 407 U.S. at 530).

## III. Analysis

### A. Length of Delay

"Depending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992). *See also United States v. Bergfeld*, 280 F.3d 486, 488 (5th Cir. 2002) ("Generally, it is accepted that a post-accusation delay approaching one year is sufficient [to trigger a speedy trial analysis]".); *Davis v. Puckett*, 857 F.2d 1035, 1040 (5th Cir. 1988) (13-month delay necessitated examination of remaining *Barker* factors); *United States v. Carter*, 603 F.2d 1204, 1206–07 (5th Cir. 1979) (16-month delay substantial enough to warrant further inquiry).

Here, the 23–26 month period between Defendants' indictment and their arrests is presumptively prejudicial, thus requiring that the Court consider the other *Barker* factors. *See Edwards*, 577 F.2d at 888 (21-month delay held to be presumptively prejudicial). However, this

---

2. The Speedy Trial Act, 18 U.S.C. § 3161(b), applies only after a defendant's arrest and is not implicated here. *See United States v. Johnson*, 815 F.2d 309, 312 (5th Cir. 1987).

delay "is not sufficient in itself to warrant a finding that [Defendants have] been denied the right to a speedy trial." *Id.* Accordingly, this factor is neutral.

**B. Reason for Delay**

"If the government diligently pursues defendant from indictment to arrest, a speedy trial claim will always fail without a showing of actual prejudice. On the other hand, if 'the Government had intentionally held back in its prosecution to gain some impermissible advantage at trial,' that fact weighs heavily against the government." *Bergfeld*, 280 F.3d at 489 (citing *Doggett*, 505 U.S. at 656–57). "If a case involves neither diligent prosecution nor bad faith delay but instead official negligence, the case occupies a 'middle ground' where the weight assigned to the factor increases as the length of the delay increases." *United States v. Serna-Villarreal*, 352 F.3d 225, 232 (5th Cir. 2003) (citing *Doggett*, 505 U.S. at 656–57).

Defendants were indicted on May 21, 2015. D.E. 1. The following day, warrants were issued for their arrest. D.E. 5, 6. At the hearing, the Government presented the following evidence of its efforts to locate and arrest Defendants.

Homeland Security Investigations (HSI) Special Agent Eric McCall testified that he received Defendants' arrest warrants from the U.S. Marshals Service on June 10, 2015, and submitted the warrants to the National Crime Information Center on June 12, 2015. 9/25 Tr. at 12:15–13:1. After cooperating witness Jessica Yasmin Lopez told SA McCall that Defendants owned multiple houses in Mission and McAllen, Texas, he researched property ownership in the Hidalgo County Appraisal District, and 2752 Melba Ave., McAllen, came up. *Id.* at 13:16–14:8. He also learned that Defendants owned and/or utilized several homes on Melba Ave., some of which were gifted to their children or otherwise titled in other people's names. *Id.* at 56:11-18.

On September 22, 2015, SA McCall emailed HSI Agent Irineo Garza, Jr., asking him to help locate Defendants. Gov't Ex. 4. According to Agent Garza's January 2016 Report of

Investigation, "HSI McAllen, along with members of Joint Task Force-West (JTF-W), South Texas Campaign (STC), Joint Targeting Team (JTT), conducted surveillance at the provided suspected location of residence on several different days in an attempt to locate [Defendants]. [Defendants] were never observed at the given location." Gov't Ex. 5. As a result, HSI McAllen closed its investigation in January 2016. *Id.*

On September 27, 2015, SA McCall emailed Border Patrol Intelligence Agents Javier Castillo and Ernesto Reyna asking them to notify agents at the McAllen Border Patrol Checkpoint about Defendants' arrest warrants. Gov't Ex. 6. In that email, SA McCall stated that attempts were being made to get another coconspirator to surrender and assist in locating Defendants. *Id.* BPA Castillo responded that Border Patrol would assist and sent SA McCall pictures of the home at 2752 Melba Ave., as well as pictures and registration information for vehicles parked there. *Id.* SA McCall responded with a list of 16 different vehicles that Defendants might be driving.[3] Gov't Ex. 23.

BPA Castillo testified that he sent requests for help in locating Defendants to more than 30 individuals with various units within Border Patrol. 10/10 Tr. at 11:25–12:24; *see also* Gov't Ex. 7. Beginning in September 2015 until BPA Castillo was reassigned in October 2016, he also conducted surveillance of Defendants' residences around 10 times and drove through their neighborhood around 20 more times. *Id.* at 12:25–15:12. On November 19, 2015, BPA Castillo informed SA McCall that he saw Pena's car parked near 2752 Melba Ave., but he did not see Pena, and so he would continue his surveillance. Gov't Ex. 8.

---

3. Besides these 16 vehicles, SA McCall testified that Defendants used an additional four cars to transport aliens that were not included in the list he sent BPA Castillo. 10/10 Tr. at 77:18. Morales was arrested after coming to the aid of her son, who was pulled over while driving a Nissan that was registered to Pena but contained a registration sticker that belonged on another vehicle. *Id.* at 47:23 – 48:22; Gov't Ex. 27. The Ford Taurus that Pena was driving at the time of his arrest also had a fictitious registration sticker. 10/10 Tr. at 68:1-5; Gov't Ex. 25, 26.

Shortly following his indictment, cooperating witness Fernando Altamirano began working with the Government. 9/25 Tr. at 81:4-6. He tried to call Defendants' old phone numbers after he was charged, but those numbers had been disconnected. *Id.* at 99:3-18. On April 7, 2016, at SA McCall's request, Altamirano contacted his ex-girlfriend via Facebook Messenger, stating that he wanted to get back in the alien smuggling business and asking if she had Morales' phone number. Gov't Ex 9; *see also* 9/25 Tr. at 20:20–22:2, 83:20–84:3. The ex-girlfriend responded that she had just been to Morales' house and was told that Morales was in Houston. *Id.* The person at Morales' house did not want to give out Morales' phone number. *Id.* SA McCall testified that he was surprised to hear that Morales was in Houston because he assumed Defendants went to Mexico, but this explained why he could not locate them in McAllen. 9/25 Tr. at 22:6-8, 23:2-7.[4]

In May 2016, SA McCall was transferred to the Houston Division, and the case was reassigned to another agent. It is unclear what that agent did between then and April 2017, when Morales was finally arrested. However, after Morales was arrested, SA McCall emailed HSI SA David Reese asking for his assistance in locating Pena. Gov't Ex. 24. SA McCall testified that he also emailed another Border Patrol special agent in McAllen asking him to send someone to Morales' May 5, 2017, hearing in case Pena was in attendance. 10/10 Tr. at 78:24–79:16.

Morales claims the Government was negligent in failing to find her at her residence at 2745 Melba Ave., where she has lived since 1987. In support of this claim, Morales offered her Texas Driver License and a utility bill for 2745 Melba Ave. dating back to June 2016. However, Morales' driver license, issued in 2016, reflects an address of 2752 Melba St. D.E. 41, Ex. 2.

---

4. SA McCall testified that cooperating witness Alejandra Salinas told him Defendants owned an apartment complex, mechanics shop, and laundry mat in Mexico. 9/25 Tr. at 44:16-22. This was corroborated by Lopez, who testified that Defendants owned an apartment complex and mechanics shop in Mexico. *Id.* at 103:18–104:1. Altamirano testified that Morales told him she owned an apartment complex in Mexico that she could run to if she were to ever get into trouble. *Id.* at 82:25–83:6.

Moreover, Lopez testified that Morales "would be at the [house] on Melba . . . several months, and then she wouldn't be there for another few months. She was moving." 9/25 Tr. at 106:3-5. It is further noted that Morales has a number of aliases listed in the Indictment, including Emma Morales-Hinojosa, Emma Morales-Pena, Emma Pena, and Dona Petra.

Pena similarly argues that the Government was negligent in failing to locate him at his residence at 2816 Sonora St. in McAllen, where he has lived since he and Morales were separated in February 2017, or at his home at 2750 Melba St. in McAllen, where he lived between 2011 and 2017 and maintains as his permanent address. *See* D.E. 55, p. 8. However, in his original motion to dismiss, Pena claims he resided at 2752 Melba St. from 2011–2017, and before that he lived at 2745 Melba St., which he maintains this as his permanent address. D.E. 43, p. 5. Pena's driver license, which was issued in May 2016, reflects an address of 2745 Melba St. D.E. 44, p. 2.

Both Defendants also claim the Government agents who conducted surveillance at the various homes on Melba Ave. should have gotten out of their cars, knocked on door(s), and asked where Defendants were; merely sitting in their cars looking through binoculars was not enough. Garza testified that he did not knock on Defendants' doors because his usual way—the "best way"—is to use visual surveillance to confirm the suspect is there. 9/25 Tr. at 73:23-25. It is not always easier to just knock on the door and ask. *Id.* at 78:14-18. SA McCall similarly testified that he prefers to conduct surveillance covertly; he tries to locate the suspect first, establish that the person is at the location, and then knock on the door and arrest them. 10/10 Tr. at 81:9-12.

Finally, Defendants argue that Government agents were negligent for failing to simply call them on the telephone. SA McCall testified that he did not try to call Defendants because he was told by cooperating witnesses that Defendants possessed numerous cell phones at a time and

would change their phones and phone numbers frequently—either monthly or any time a coconspirator was arrested. 9/25 Tr. at 22:12-17. Lopez similarly testified that it was hard to keep up with Morales' phone numbers because "[s]he had multiple phones, and she would constantly change them. If she felt that they were maybe being listened to or there was something going on, she would change numbers." *Id.* at 106:9-15.

Based on the evidence presented, the Court finds the Government diligently pursued Defendants through October 2016, when BPA Castillo was reassigned and discontinued his surveillance of the Melba Ave. homes. The Government's failure to continue its pursuit for the next six months until Morales was arrested in April 2017 constitutes official negligence. However, Defendants have offered no argument or evidence that the Government intentionally held back its prosecution in order to gain some tactical advantage at trial. Moreover, Defendants' use of multiple phones, vehicles, and addresses—at least in part to evade law enforcement—contributed to the Government's delay in eventually locating and arresting them.

This case occupies a "middle ground," rendering this factor neutral.

### C. Assertion of Right

Defendants claim they were unaware they were under indictment until their arrests in 2017. In support of this claim, Defendants argue they would not have renewed their Texas Driver Licenses in person if they knew they were under indictment and there were warrants out for their arrest. Texas Department of Public Safety (DPS) Service Representative Ana Castor testified that both Morales and Pena came into the McAllen DPS Driver License Office to renew their licenses in 2016, at which time each Defendant's transaction history showed that they had active warrants. 10/10 Tr. at 31:3–21:19, 33:17–34:19; *see also* Gov't Exhs. 19, 20. However, Defendants were not arrested because there are no DPS officers or other law enforcement assigned to the Driver License Office, and the service representatives' jobs are solely

administrative. 10/10 Tr. at 28:13–29:13, 38:10-22. Still, Castor acknowledged that some people with warrants may not want to renew their licenses in person because the McAllen Driver License Office is in the same building as the Texas Highway Patrol and across the street from the McAllen Police Department. *Id.* at 35:23–37:17.

In response, the Government presented evidence that both Defendants used to cross the United States/Mexico border at least once a month for years, but they stopped immediately after their indictment. 9/25 Tr. at 9:22–10:22. Pena also dropped a civil suit based on the denial of his N-400 Application for Naturalization four days after he was indicted. *Id.* at 11:13–12:14. Based on an email from United States Citizenship and Immigration Services Associate Counsel Theodore Walter to SA McCall, Pena voluntarily dismissed his citizenship lawsuit "as a result of the indictment." Gov't Exh. 3. The Government further points out that Pena should have been on notice that he was facing charges in this case when his wife was arrested, as the indictment also listed Pena's name. Taken together, the facts tend to show that Defendants were aware they were under indictment for some time before their arrests.

Furthermore, Defendants—especially Morales—have not vigorously pursued a speedy trial. Morales first asserted her right to a speedy trial on July 25, 2017—three months after her arrest. She has also requested continuances of all three pretrial conferences scheduled so far in this case. *See* D.E. 21, 33, 46. Pena has moved for one continuance since his arrest. The Fifth Circuit has recognized that repeated requests for continuances are "indicative of the degree of seriousness with which [a defendant] asserted his right to a speedy trial," noting that four continuances showed the defendant "was in no great hurry to get to trial." *Robinson v. Whitley*, 2 F.3d 562, 569 & n.3 (5th Cir. 1993).

This factor weighs against dismissal.

**D. Prejudice**

"In applying a *Barker* balancing, the court must weigh the first three *Barker* factors—length of the delay, reason for the delay, and defendant's diligence in asserting his right—against any prejudice suffered by the defendant due to the delay in prosecution." *Serna-Villarreal*, 352 F.3d at 230 (citing *Robinson*, 2 F.3d at 570). "Obviously, in this balancing, the less prejudice a defendant experiences, the less likely it is that a denial of a speedy trial right will be found. Ordinarily, the burden of demonstrating such prejudice rests on the defendant." *Id.* "The [*Barker*] Court isolated three ways in which the defendant might be prejudiced by the delay [i] by lengthy pretrial incarceration, [ii] by a substantial impairment of his defense, and [iii] by being subjected to public scorn and personal anxiety." *United States v. Dyson*, 469 F.2d 735, 741 (5th Cir. 1972).

Here, Defendants claim the post-indictment delay has caused them "actual and substantial prejudice" based on the "possibility" that their defenses "will be impaired by dimming memories and loss of exculpatory evidence." D.E. 35, pp. 2, 8; D.E. 42, pp. 2, 8; D.E. 55, pp. 2, 11–12. The defendants in *Marion* similarly "rel[ied] solely on the real *possibility* of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost." *United States v. Marion*, 404 U.S. 307, 325–26 (1971) (emphasis added). The Supreme Court rejected this claim and held that, "[i]n light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment." *Id.* The 10-year statute of limitations for conspiracy to transport undocumented aliens as set forth in 18 U.S.C. § 3298 has not expired in this case.

Moreover, Defendants have not identified any witnesses whose memories have been impaired on a material issue or who will be unavailable for trial, nor have they identified any material, exculpatory evidence that has been lost. *See United States v. Edwards*, 577 F.2d 883,

889 (5th Cir. 1978) (record did not support a finding of prejudice where no lapses in memory "substantially relate to a material issue" and the delay did not "result[] in the unavailability of material witnesses"); *see also United States v. Lucien*, 61 F.3d 366, 370–71 (5th Cir. 1995) ("Because Lucien completely fails to show that the alleged lost evidence or missing witness in any way impaired his defense, he cannot establish actual prejudice from the delay.") (citing *United States v. Royals*, 777 F.2d 1089, 1090 (5th Cir. 1985) (defendant must show that lost evidence is material, exculpatory, and otherwise unobtainable); *United States v. Neal*, 27 F.3d 1035, 1043 (5th Cir. 1994) (defendant who failed to explain relevance of lost witness's testimony could not show prejudice)).

As set forth *supra*, the Court finds that the Government's negligence is responsible for six months of the delay between October 2016 and April 2017. "[A]lthough the government was not diligent in pursuing its prosecution against [Defendants] during this . . . period, this delay was not so excessive so as to require the state to rebut the presumption of prejudice." *Robinson*, 2 F.3d at 570 (citing *Doggett*, 505 U.S. at 658). Because Defendants have failed to meet their burden of demonstrating any prejudice, this factor weighs against dismissal.

## IV. Conclusion

In sum, two of the *Barker* factors (length of delay and reason for delay) are neutral, while two factors (assertion of right and prejudice) weigh against dismissal. Accordingly, Defendants' motions to dismiss the indictment on speedy trial grounds (D.E. 35, 43) are **DENIED**.

It is so **ORDERED** this 29th day of November, 2017.

_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE